## Helfenstein *versus* Leonard.

*Severance by defendants in ejectment.— Co-defendant not competent witness for defence after judgment in his favour.—Discretion as to discharge of one of several defendants for want of testimony, when reviewed in error.*

1. Where ejectment is brought for several distinct properties against two or more defendants, they may defend separately on their separate titles, unless the titles are identical, as where the parties occupy the position of landlord and tenant of the same premises : the defendants having in such case the same interest to defend, it is error to permit a severance on the trial.

2. A confession of judgment in ejectment by a tenant for years who was

[Helfenstein *v.* Leonard.]

joined as co-defendant with his landlord, has no effect on the title and amounts to nothing.

3. A defendant in ejectment may defend himself from all the consequences of an adverse verdict by showing that he was not in possession of the premises at the service of the writ or since.

4. Although what is known, in actions of ejectment in England, as the "consent rule," has no existence in Pennsylvania, it must still be proved on the trial that all the defendants were in possession at the service of the writ.

5. Notwithstanding the return of the sheriff is evidence of the possession of defendant, it is only *primâ facie*, and may be rebutted by the defendant after the return is in evidence, which done, he is entitled to judgment for costs, but this is a question of fact for the jury, and it is error in the court to decide it, unless there is a manifestly vexatious joinder of defendants for the purpose of depriving one or more of them of the testimony of a co-defendant.

6. Where the court below, in the exercise of its discretion, directs a judgment in favour of one of two or more defendants, the Supreme Court will inquire not whether the judicial discretion was soundly exercised, but simply whether it was a case proper for the exercise of such discretion.

7. A defendant in ejectment who was tenant for years of his co-defendant, in whose favour a judgment was entered by the court on the ground that he was not in possession of any of the premises named in the writ, except one, in respect to which he confessed judgment, is not thereby rendered a competent witness for the defence.

8. Whether a will on which one of the parties in ejectment relied was or was not surreptitiously destroyed by his opponent, is a question exclusively for the jury.

Error to the Common Pleas of *Cumberland county*.

This was an action of ejectment by Julia A. Helfenstein, who sued as well for herself as for her minor children, against Edward B. Leonard and Edward B. Leonard, Jr., for a three-storied brick house, frame shop, and lot of ground in the borough of Carlisle, an adjoining two-storied stone plastered house and lot of ground, and an out-lot containing about six acres.

There was a service on both defendants, and a general appearance for both by counsel.

The property was formerly owned by William Leonard, now deceased, and both parties claimed title through him.

The plaintiffs alleged that William Leonard devised the property to his nephew Edward Helfenstein, who subsequently assigned it with other property for the benefit of his creditors ; that after the death of Edward Helfenstein his assignee sold it to his widow the plaintiff, who purchased for herself and her minor children.

Edward B. Leonard, Sr., one of the defendants, claimed title as one of the heirs at law of his brother William Leonard, and as alienee of his sister, Mrs. Elizabeth Helfenstein, the only other heir of William Leonard.

There was no will discovered after the death of William Leonard, although it was proved and not controverted that he had, in the latter part of September 1858, about sixteen months before his death, executed a will in due form, in the pre-

sence of four subscribing witnesses, by which he devised the property in controversy to Edward Helfenstein. William Leonard retained the possession of this will after it was executed, and died January 8th 1860. The will written by Mr. Smiley, the contents of which he proved, and which he testified was retained by testator after its execution, was never produced or discovered after his death, and the allegation of the plaintiffs was, that it had been illegally and fraudulently destroyed by Edward B. Leonard, Sr., the brother of testator, or by Edward B. Leonard, Jr., the son of Edward B. Leonard, Sr. The defendant did not controvert the execution and existence of the will, but alleged that it was destroyed by William Leonard himself, during his last sickness, and a short time before his death.

To establish the allegation that the will was improperly and illegally destroyed by Edward B. Leonard, Sr., or his son Edward B. Leonard, Jr., the plaintiffs relied upon the declarations of the father and son made at different times, to several witnesses, on the subject of the destruction of the will. Mr. Smiley, who wrote the will, testified that in a conversation with Edward Leonard, Jr., two or three days after the death of William Leonard, to the best of witness's recollection, Edward stated that he or his father had destroyed the will at the request of his uncle William a day or two before his death. Thomas Hacket testified that he asked Edward Leonard, Sr., a few days before William Leonard's death, whether William had destroyed that will, and he replied not to his knowledge, or not that he knew of. He further testified that Edward Leonard, Jr., a few days after his uncle's death, told witness, that his uncle had directed him to burn or destroy the will, and that he had done according to his directions; that he said it was some days before his uncle's death.

William Griffin stated that at one time Edward Leonard, Sr., in a conversation with him, stated that his brother William had made a will; that when Edward came from Perry county William was sitting at the stove, and told Edward to go to a little drawer and fetch his will to him. That he did so, and his brother took the will, tore it to pieces, and threw it in the stove. The same witness stated that at another time Edward Leonard, Sr., told him that when he came from Perry county his brother William was in bed, and then told Edward to go to a little drawer and bring the will; that Edward did so, and William then took the will, tore it to pieces, and threw it on the floor.

Miss Sturm testified that Edward B. Leonard, Jr., told her he had destroyed his uncle's will at his request; that he told her this a day or two before or after William Leonard's death.

Frederick Cornman stated, Edward B. Leonard, Jr., told him he had destroyed his uncle's will at his request, a few days before his death.

[Helfenstein *v.* Leonard.]

In addition to this evidence of contradictory statements by Edward B. Leonard and his son Edward, in reference to the destruction of William Leonard's will, plaintiffs gave evidence of the friendly feeling entertained by William Leonard towards his nephew Edward Helfenstein, and his declarations that he intended to leave him a considerable portion of his estate. And, further, that he was not, and had not been for some years, on friendly terms with his brother Edward.

These facts were controverted, and it was averred that the brothers were not on unfriendly terms; that Edward Helfenstein knew of the will and once had it in his possession; that after the death of William Leonard, Helfenstein applied for letters of administration on his estate; that he never made any claim to this property, but allowed the estate to be treated as an intestacy; and that three or four days before his death the testator had told his physician, that, as things had transpired he had no will, he should not make one; he had a brother and sister, and they would take charge of his property in case he should not recover, &c.

The action was tried the 19th January 1865, in the second week of the January Term of the court. The first plea of the defendants was filed 27th September 1864, and was as follows:—

"The said Edward B. Leonard, Sr., appears and pleads not guilty.

"And the said Edward B. Leonard, Jr., appears, and admits that he is the tenant in possession of the three-story brick house and lot of ground on which the same stands, on the corner of Hanover and Louther streets; that he holds and occupies the same as lessee, under an article of agreement in writing in which Edward B. Leonard, Sr., is the lessor, dated the　　day of　　, A. D., 18　, he paying an annual rent of $200 in quarterly payments to the said Edward B. Leonard, Sr., and the taxes which may be annually assessed on said property; and as to the other lands and tenements named in the writ, the said Edward B. Leonard, Jr., disclaims and disavows any right, title, interest, property, or possession in and to the same, or any part thereof."

In the first week of the January Term 1865, the defendants, in accordance with the rules of practice and evidence, made a preliminary motion for a severance of trial; on which motion the court afterwards on consideration, suggested that Edward Leonard, Jr., put in a more formal plea, which was done as follows:—

"And the said Edward B. Leonard, Jr., by his attorneys Penrose, Humrich, and Todd, says that he is not guilty of the alleged trespasses and ejectment, above laid to his charge in manner and form as the said plaintiffs have thereof complained against him; but the said Edward B. Leonard, Jr., cannot and does not gainsay the complaint of the said plaintiffs so far as it relates to the property described in his writ and complaint as situated on the

corner of North Hanover and Louther streets, being the three-
story brick dwelling-house and back building, exclusive of the
frame shop and adjoining two-storied brick dwelling-house, which
he admits and confesses is now, and has been since the 1st day of
April 1861 in his possession as a tenant, under a written lease
from Edward B. Leonard, Sr., dated the 13th day of April, A. D.
1861, he paying an annual rent of $200, in quarterly payments,
to the said Edward Leonard, Sr., and the taxes which may be
annually assessed on said property, and of this the said Edward
B. Leonard puts himself upon the country," &c.  On this plea the
court entered the following order.  " And the said Edward B.
Leonard just having by his plea acknowledged that he could not
gainsay the complaint of the said plaintiff so far as it relates to
the property described in plaintiff's writ and complaint, as situ-
ated on the corner of North Hanover and Louther streets, being
the three-story brick dwelling-house and back building, exclusive
of the frame shop and adjoining two-storied brick dwelling-house,
and admitted and confessed that he is and has been in possession
as a tenant since the 1st day of April 1861, under a lease from
Edward B. Leonard, Sr., he paying an annual rent of $200 to
the said Edward B. Leonard, Sr., and the taxes which may be
assessed on the aforesaid property, &c.  Whereupon the court
enters judgment against the said Edward B. Leonard, Jr., in
favour of the plaintiff for the real estate described in the afore-
said plea of the said Edward B. Leonard, Jr.  And it is directed
that the trial proceed between the plaintiffs and the said Edward
B. Leonard, Jr., as to the other real estate described in plaintiffs'
writ and statement, and to which the said Edward B. Leonard, Jr.,
has put in the plea of not guilty.  By order of the court."

The trial then proceeded against both defendants, and the plain-
tiffs having, as was alleged, failed to show any possession in
Edward Leonard, Jr., in the other real estate, the counsel of
defendants asked that a verdict be rendered in favour of E. B.
Leonard, Jr., as to the two properties mentioned in plaintiff's
statement to which he has put in the plea of not guilty, on the
ground that the said Edward B. Leonard, Jr., was not at the time
of the commencement of this suit in possession of said properties
or either of them, so that the said Edward B. Leonard, Jr., may
be examined as a witness."

The court disposed of this motion as follows:—

" There is no evidence tending to show that Edward B. Leo-
nard, Jr., one of the defendants, was at the time of the commence-
ment of the present action, or since, in possession of the house and
lot on the railroad, or the two-story brick house on the east side
of North Hanover street.  The only evidence relied on by plain-
tiff to show possession of these properties in Edward B. Leo-

14 WR.—30

nard, Jr., is that of F. Cornman, who says that E. B. Leonard, Jr., gave him some young cherry-trees growing on the lot on the north side of railroad; that he talked of claiming the lot in pursuance of a letter written to him by William Leonard, the decedent; that he would give him the lot if he would come to Carlisle. But there is no evidence that he went into possession under this alleged claim or exercised acts of ownership over it, except digging up some young cherry-trees, while the lot was in the possession and occupancy of the tenant of his father, Edward B. Leonard, Sr. On the contrary, the evidence is, that Edward B. Leonard, Sr., went into possession of both the lots named, by his tenants, on the death of William Leonard, and has retained the possession and received the rents up to the present time. The *primâ facie* evidence of possession by the sheriff's return has been clearly rebutted by the evidence of exclusive possession, and the leasing and receipt of the rents by Edward B. Leonard, Sr., and that Edward B. Leonard, Jr., was not in possession when served with the writ, and under the evidence, we do not think that Edward B. Leonard, Sr., the actual and only party in interest as defendant, ought to be deprived of the evidence of Edward B. Leonard, Jr. It is true the witness offered is the son of the real defendant in interest, but this objection does not affect his competency, and his credibility is a question for the jury. Under the circumstances stated, we consider it our duty to direct the jury to render a verdict in favour of E. B. Leonard, Jr., on the ground that the evidence has failed to prove the possession of Edward B. Leonard, Jr.;" which was accordingly done.

The court then ordered the trial to proceed as to Edward B. Leonard, Sr. The plaintiff excepted to this ruling on the ground that Edward B. Leonard, Jr., was a party to the action; that the writ had been served upon him; that he had pleaded; that there was proof in the cause of his declaration that he claimed the six-acre lot of ground as his own; that he exercised acts of ownership upon it; that he received part of the rent of it from a tenant; and that he resided upon, and. at the time of the trial resided in the house and lot for which the ejectment was brought, and was liable for costs and mesne profits; and that the proof in the cause pointed to him who was guilty of the fraud of destroying the. will, in order to defeat the plaintiff's title., Subsequently the defendant offered Edward B. Leonard, Jr., as a witness, and the court under exceptions admitted him to testify, as well with regard to the three-story brick house and lot in which he resided when the ejectment was brought, and at the time of the trial; as to the other houses on the same lot, and all the property in dispute.

The plaintiff requested the court to charge the jury upon the following points, and to file their charge of record:—

1. That the evidence in the cause establishes the fact beyond a

[Helfenstein v. Leonard.]

doubt, that William Leonard did make a will; that it was duly executed according to all the forms required by the law; that by his said will he did devise to Edward Helfenstein all the property for which this action of ejectment is brought; that by the deed of assignment of the said Edward Helfenstein all the said property was lawfully vested in Charles P. Helfenstein and John Foy, his assignees; and that by their deed, in evidence, the title to the said property was lawfully vested in the plaintiffs in this action.

2. That the will so made could only be revoked or cancelled by one of the modes pointed out by the Act of Assembly of the 8th April 1833, and that as to the corner lot on which the brick houses are built, and which is first described in the plaintiff's statement, there is no evidence in the cause that the will was so revoked or cancelled. And that in the consideration of this subject the jury are bound wholly to discard and disregard the testimony of Edward B. Leonard, Jr., because he is a party to that issue.

3. That if the jury disbelieve the testimony of Edward B. Leonard, Jr., then the plaintiffs are entitled to their verdict for the whole of the property for which this ejectment is brought; for there is not legal evidence before the jury of any cancellation of the will apart from that of the said Edward B. Leonard, Jr.

The defendant also asked the court to charge the jury, and file their charge of record in this case upon the following points:—

1. Heirs at law are not to be disinherited on doubtful and conflicting testimony, and where the whole evidence in the cause leaves doubt and uncertainty about the title adverse to that of the heirs, the latter must prevail; therefore in the present action defendants representing the heirs at law of William Leonard, his title must prevail in the absence of clear and conclusive evidence of a will remaining unrevoked at the death of William Leonard.

2. The evidence of the plaintiffs shows that there is but one witness who knew the contents of the alleged will, and he is named as a devisee therein according to the contents as remembered by him; in order to defeat the title and possession of the heirs at law of William Leonard, deceased, to wit, Edward B. Leonard, Sr., and Mrs. John P. Helfenstein, the mother of Edward Helfenstein, strict and full proof of such contents by two competent witnesses is necessary, and this not having been given, the plaintiffs cannot recover.

3. The policy of our collateral inheritance tax laws requires the probate of all wills before the register of the proper county, and since the Act of 1856, making that probate conclusive as to real estate at the end of five years, all wills must, before they can be used as the foundation of an action, be proved before the proper register; the alleged will in this suit never having been so proved,

[Helfenstein *v.* Leonard.]

will not sustain the present action, and the plaintiffs cannot recover.

4. The plaintiff having proved that the alleged will was in the exclusive possession of William Leonard, the testator, that it never was in the care or custody of any one else, except when committed to Edward Helfenstein, the principal devisee, to carry up stairs in Mr. William Leonard's house, and no search having been proved to have been made for it, either by Edward Helfenstein in his lifetime (although he had notice that there was no will, by a letter from Edward B. Leonard, Sr., at the death of William Leonard), or by those claiming under him, and the will not being produced, or proved to be in existence, the legal presumption arises that it was designedly destroyed by William Leonard in his lifetime *animo revocandi*, and said presumption not having been rebutted by the plaintiffs, they cannot recover.

5. If the jury believe that William Leonard told Edward B. Leonard, Jr., that he had burned and destroyed the will testified to by J. W. Smiley and others, and that he also afterwards told Dr. J. T. Ward that he had no will, and would make none, but would leave his property to his brother and sister, such declarations and statements, in connection with the other corroborating circumstances in the cause, amount to legal proof of the destruction of the alleged will, and plaintiffs cannot recover.

The learned judge, after stating the case and recapitulating the testimony in relation to the execution and alleged destruction of the will, instructed the jury that where a will is shown to be in possession of a testator and cannot be found after his death, the legal presumption, in the absence of all proof on the subject, is that it was destroyed by the testator, but that this presumption might be rebutted by evidence tending to show a spoliation by others, either in the lifetime or after the death of testator. The learned judge then proceeded:—

" The question presented is narrowed down to but a single inquiry: Who destroyed the will of William Leonard? If it was improperly and illegally destroyed by Edward Leonard or his son, or any other person, without the knowledge, or contrary to the design and intention of William Leonard, then the plaintiffs ought to recover. But if the will was destroyed by William Leonard himself, or by his brother Edward, or his nephew Edward, or by any other person, by the direction and in the presence of William Leonard, then it would be of no validity, and your verdict should be for the defendant. Edward Leonard, Jr., has been examined as a witness, and testifies that he received a letter from his uncle asking him to come to Carlisle. This letter is in evidence and will be out with you. That after he came over he found his uncle sick, sitting in his rocking-chair ; that his uncle asked him whether he was aware that he had made a will; that he then said he was

[Helfenstein v. Leonard.]

surrounded by strangers at that time, not a friend about him; that he further stated to witness that he had directed Edward B. Leonard to go down stairs and bring him the will; that Edward B. Leonard, brother of deceased, brought him the will, and that William told witness he had torn the will and thrown it in the stove; that he then directed witness to get a second will which he would find in the drawer of his sideboard, that had not been executed; that this will was taken to William Leonard by witness, who tore it and threw it in the coal-bucket.

"The evidence of Dr. Ward, the attending physician, is also relied upon by defendant, as corroborative of the evidence of Edward B. Leonard, Jr., in proving that William Leonard died intestate. Dr. Ward testified that three or four days before William Leonard's death, while sitting up on his chair, he told the doctor that as things had transpired he had no will; he should not make one; he had a brother and sister, and they would take charge of his property in case he should not recover. If this evidence is credited, it has, to our minds, a strong tendency to establish the alleged fact that William Leonard had cancelled or destroyed the will he had made prior to his death, and intended to die intestate.

"The character of Edward B. Leonard, Jr., for truth and veracity has been impeached. Several witnesses have testified that they have heard reports injurious to his character for truth; but a greater number, called on the other side, have sustained his character, and testified that they never heard his reputation as a man of truth and veracity questioned. Under these circumstances, what credence is to be given to his testimony we submit to you to determine.

"In addition to the testimony of Edward B. Leonard, Jr., and Dr. Ward, to which we have referred, the defendants contend that there are circumstances in evidence that go strongly to fortify and corroborate the position that William Leonard destroyed his own will and died intestate.

"Although the two brothers, William and Edward, had not been on intimate friendly terms some years prior to William's death, the defendants allege that a year or more before William's death the brothers had become reconciled, and the most intimate social friendly relations subsisted between them for more than a year before the death of William; and William wrote to Edward in November 1858 that he wished to see him, and to come and stay with him for some time. That Edward did come and remained with him till the time of his death, in January 1860. That he afterwards, in December 1859, shortly before his death, wrote to his nephew, Edward Leonard, to come over, and he would give him a lot, and that the nephew did come over, and he and his father remained, and nursed and attended to, and cared for

William in his last illness, and up to the time of his death. These circumstances we say are relied upon by defendant as corroborative of the evidence of Edward Leonard, Jr., and Dr. Ward, that William Leonard, after his brother and nephew, at his request, came over and attended to and nursed him, while receiving these kindnesses and attentions, changed his mind as to the disposition of his estate, destroyed his will and died intestate, that his estate might be divided between his brother Edward and his sister Mrs. Helfenstien.

" We have referred very briefly to the prominent facts relied on by the parties to prove, on the one side the testacy, and on the other the intestacy of William Leonard. The facts are for your determination, and to you we submit them to find such verdict as the evidence requires. If you find that a will was duly executed which devised the property in controversy to Edward Helfenstein, and that such will was not cancelled or destroyed by William Leonard, or by his directions, then your verdict should be for the plaintiff. If, on the contrary, you find that the will which was executed by William Leonard was afterwards destroyed by him, or by any other person in his presence and by his direction, then your verdict should be for the defendant."

The points presented by plaintiff's counsel were answered as follows :—

" 1st point. We think the evidence satisfactorily establishes the facts recited in this point in reference to the making and execution of the will. And if the will was not revoked by William Leonard in his lifetime, the deeds recited would vest the title to the property in dispute in the present plaintiffs.

" 2d point. A will when executed can only be revoked in the manner stated in this point. But we cannot say there is no evidence that the will was so revoked, as to the corner lot on which the brick houses are built ; nor can we say to you that in the consideration of this subject you are bound to disregard the evidence of Edward B. Leonard, Jr., because he is a party to that issue. There is no issue pending to which Edward B. Leonard, Jr., is a party. He has admitted his possession, and there is a judgment against him as to the corner brick house and lot, and a verdict in his favour as to the other properties in plaintiff's declaration.

" 3d point. We cannot answer this point in the affirmative. There is evidence in the case from which the jury may infer that the will was destroyed by William Leonard in his lifetime, irrespective of the evidence of Edward B. Leonard. Whether the evidence in the case, with or without the testimony of Edward B. Leonard, Jr., shows that the will was cancelled or destroyed by William Leonard before his death, is a question you must determine."

The points of defendant's counsel were thus disposed of :—

[Helfenstein v. Leonard.]

"1st point. We answer this point in the affirmative. The title of the heir at law ought to prevail, in the absence of clear and satisfactory evidence of a will remaining unrevoked at the death of William Leonard.

"2d point. We cannot answer this as requested. The law requires the execution of a will to be proved by two witnesses, but not that its contents be proved by two witnesses.

"3d point. We answer this in the negative. The probate of a will before the register is not required to give validity to a devise of real estate.

"4th point. The legal presumption upon the non-production of a will proved to be in existence in the lifetime of testator, in the absence of all evidence on the subject, would be that it was designedly destroyed by the testator in his lifetime, *animo revocandi*. But whether that presumption has been rebutted by the plaintiffs in this case, by the evidence in the case, is for you to determine.

"5th point. The declarations of William Leonard to Edward B. Leonard and Doctor J. T. Ward, as recited in this point, if believed by the jury, are legal evidence going to show that the deed was destroyed by William Leonard in his lifetime, and which you will consider in determining the question whether William Leonard destroyed the will, or whether it was destroyed by Edward B. Leonard, his brother, or Edward B. Leonard, Jr., his nephew, without the knowledge and against the consent of William Leonard. But we cannot say to you that this evidence, if believed, must necessarily defeat plaintiff's recovery; for in determining the rights of the parties, you must consider the whole evidence, and not detached and isolated parts of it only."

Under these rulings there was a verdict and judgment in favour of the defendant. This writ was thereupon sued out by plaintiff, for whom the following errors were assigned :—

1. The court erred in entering a judgment against Edward B. Leonard, Jr., for a part of the property in dispute, and directing that the trial should proceed as to the other part, only, so far as he was concerned; and that as to the other defendant the trial should proceed as to the whole of the property.

2. The court erred in taking from the jury the consideration of the facts as to the possession and claim of title of Edward B. Leonard, Jr., to the property, in the face of evidence that he did claim the lot as his own, that he did exercise acts of ownership upon it, and that he did make himself accountable for mesne profits by the receipt of a part of the rent, and in the face of his acknowledgments that he destroyed the will, so as to qualify him to be a witness to prove that he did not destroy the will, but that his father did it.

[Helfenstein *v.* Leonard.]

3. The court erred in the instruction to the jury when they said, "When a will is shown to be in possession of testator and cannot be found, or produced after his death, the legal presumption, in the absence of all proof on the subject, is that it was destroyed by the testator."

4. The court erred in answer to plaintiff's second point when they say, "But we cannot say there is no evidence that the will was so revoked as to the corner lot on which the brick houses are built; nor can we say to you that in the consideration of this subject you are bound to disregard the evidence of Edward B. Leonard, Jr., because he is a party to that issue."

5. The court erred in their answer to the plaintiff's third point when they say, "There is evidence in the case from which the jury may infer that the will was destroyed by Mr. Leonard in his lifetime, irrespective of the evidence of Edward B. Leonard, Jr."

6. The court erred in their answer to the defendant's first point, which is that the title of the defendant "must prevail in the absence of clear and conclusive evidence of a will remaining unrevoked at the death of Mr. Leonard," to which the court answer, "We answer this point in the affirmative."

7. The court erred in answer to the defendant's fourth point in saying, "The legal presumption upon the non-production of a will proved to be in existence in the lifetime of the testator, in the absence of all evidence, would be that it was designedly destroyed by the testator in his lifetime, *animo revocandi*."

8. The court erred in answer to the defendant's fifth point in saying that "The declaration of Mr. Leonard to Edward B. Leonard, Jr., and Dr. J. T. Ward, as recited in the point, if believed by the jury, are legal evidence going to show that the will was destroyed by William Leonard in his lifetime."

9. The court erred in the admission of Edward B. Leonard, Jr., as a witness.

*W. H. Miller* and *Watts & Parker*, for plaintiff in error.

*Todd & Humrich* (with whom were *Penrose* and *Eli K. Price*), for defendant.

The opinion of the court was delivered, June 29th 1865, by

Woodward, C. J.—The writ in this case described three distinct properties: the two messuages and lots in the borough of Carlisle, and the outlying six-acre lot. No exception was taken to it on this ground, and we are not going to say it was exceptionable, but it is a circumstance that should not be forgotten whilst we review the subsequent proceedings.

Both defendants were served with the writ: they were father and son, and the appearance of counsel was general for both. On

[Helfenstein v. Leonard.]

the 27th September 1864 they pleaded separate pleas, the father, Edward B. Leonard, Sr., the general issue, and the son, Edward B. Leonard, Jr., a special plea in which he admitted himself in possession of the three-story brick house and lot, as lessee of his father at an annual rent, and as to the other lands and tenements in the writ, he " disclaims and disavows any right, title, interest, property, or possession in and to the same or any part thereof."

On the 9th January 1865 counsel obtained a rule to show cause why a separate trial as to each of the properties claimed should not be ordered, so that the defendants may sever. On the return of this rule, Edward B. Leonard, Jr., at the suggestion of the court, put in a more formal plea, that he was not guilty of the alleged trespasses and ejectment above laid to his charge in the manner and form as the said plaintiffs have thereof complained against him, but that he cannot and does not gainsay the complaint of the plaintiffs so far as it relates to the three-story brick dwelling-house and back-building, exclusive of the frame shop and adjoining two-storied brick dwelling-house, which he admits and confesses is now and has been since 1st April 1861 in his possession as tenant of his father, under a written lease, at an annual rent, and for this he puts himself upon the country.

On this plea the court entered judgment against Edward B. Leonard, Jr., in favour of the plaintiffs, for the three-story brick house described in the plea, and directed the trial to proceed between the plaintiffs and the said E. B. Leonard, Jr., as to the other real estate described in plaintiffs' writ.

This was the court's disposition of the rule obtained on the 9th of January, and on the 19th of January a jury was called, who on the 24th of January, after the plaintiffs had closed their evidence in chief, on motion of defendants' counsel and under the instruction and direction of the court, " found for Edward B. Leonard, Jr., on the ground that he never was in possession of the premises mentioned and described in his plea of not guilty." Thereupon judgment was entered upon the verdict and the trial ordered to proceed as to Edward B. Leonard, Sr.

Edward B. Leonard, Jr., was admitted as a witness for his father, and a verdict passed in the father's favour for all the premises, and upon that verdict a judgment was entered.

Thus it happens that in this one ejectment suit there are three judgments upon the record : one for plaintiffs and one for each of the defendants. The regularity of these proceedings must be considered, not only because they are complained of in the assignment of errors, but because they bear very materially upon the question of the son's competency as a witness, which is a vital question.

When a plaintiff brings ejectment for several distinct messuages or properties, against two or more defendants, they have a right

to defend themselves separately on their respective titles, if they have separate titles to defend: White *v.* Pickering, 12 S. & R. 435. They may, indeed, conclude themselves by pleading jointly, though even then, each may show his title to all or part of the premises, and both or either may recover his costs, in case of success: Jones *v.* Hartly, 3 Whart. 191.

But in this case the defendants had not separate titles, and therefore had no right to separate trials. Nothing can be more thoroughly identical than the titles of a landlord and his tenant. They may have their squabbles about rent, the possession, repairs, taxes, or what not, but except in cases of fraud, or conveyance of title by the landlord, they never can come in conflict upon a question of title, not even when a new landlord, to whom the tenant has attorned, appears in the field: Boyer *v.* Smith, 5 Watts 64. In possession under and by virtue of the title of his landlord, the tenant can neither dispute it himself nor assist others to contest it. If sued in ejectment, it is made his duty by the old Act of 1772 to give notice thereof to his landlord *forthwith*, under penalty of forfeiting the value of two years' rent, and it is one of the rights of the landlord to appear and defend such suit " by joining with the tenant."

If the plaintiffs had not put the landlord upon record in this instance, he was entitled to place himself there, to *join* the tenant, in the language of the statute, to defend, not a separate title, but to make a joint defence in behalf of one and the same title—their joint or common title. Nor were the court ignorant that E. B. Leonard, Jr., proposed to defend in character of tenant of his father, for in both his special pleas, the original and the amended, the tenancy is very distinctly averred. Then he should not have been treated as a defendant having a separate interest to defend, and the learned judge fell into error, when he suffered a confessed tenant to sever, in pleading, from his landlord.

But was there really any severance ? What were the nature and effect of the pleas of E. B. Leonard, Jr. ? His first plea consisted of two parts : a confession of judgment as to the three-story brick house, and a disclaimer as to all the rest of the premises sued for. Whether a disclaimer can be treated as a plea in ejectment in view of what was said of it in Steinmetz *v.* Logan, 3 Watts 160, Mitchell *v.* Bratton, 5 Id. 70, and Zeigler *v.* Fisher, 3 Barr 365, need not be considered, because the first special plea was superseded by the amended and more formal plea on which the court rendered judgment, and in this second plea there is no disclaimer whatever. This plea also consists of two parts : a confession of judgment as to the three-story brick house, and a plea of not guilty as to all the rest. We can make nothing more out of it than this.

But if this were all, the court did right to enter judgment for the plaintiffs against E. B. Leonard, Jr., for the brick house and

lot, and as to the residue of the premises, should have treated him as pleading, like his father, the general issue. It was his duty to plead the general issue, both because the statute enjoins it, and because it was the only plea that could protect his landlord's title. Not guilty is the general issue in ejectment at common law, and it shall be the plea in ejectment, saith our Act of 1807, Purd. 366. More words were employed than were necessary to place this plea upon the record, but they amount to just the statutory plea—nothing more, nothing less. And just that was the plea of the elder Leonard. Where, then, was the severance? As to the brick house there *was* a severance, which amounted to nothing, however, for a confession of judgment by a tenant for years touches not the title; but as to the rest of the premises, the two defendants placed the same plea upon the record.

Seeing, then, that the tenant had no interest to defend that was not identical with that of the landlord, and that their pleas were identical, the next observation to be made is, that if the court had a right, in the exercise of a sound judicial discretion, to order separate trials, they did not make the trials separate. As we understand the record, one jury only were sworn to try the issue as to both defendants. On the 24th of January 1865, after the plaintiffs had closed their testimony, the court directed the jury to find a verdict for Edward B. Leonard, Jr., "on the ground that he never was in possession of the premises mentioned and described in his plea of not guilty." Was this right? I hold that it is competent for a defendant in ejectment to defend himself from all the consequences of an adverse verdict, by showing that he was not in possession of the premises at the service of the writ or since. "The consent rule," which was invented to dispense with proof of lease, entry, and ouster, is now altered by orders of the different courts in England, so as to include the confession of possession as well as of lease, entry, and ouster, and therefore no proof of possession is required in those courts, unless there should be some dispute as to the identity of the premises, when the consent rule must be produced: Adams on Ejectment, 4th Am. ed., p. 319.

But with us the law is not quite so. We have dispensed with the consent rule by sweeping away the fictions of lease, entry, and ouster, and placing the parties in ejectment upon their respective titles. The plaintiff, however, must still prove the defendant in possession. The 2d section of the Act of 1807, Purd. 365, makes the return of the sheriff, that he has served the writ of ejectment, evidence that all the parties served are in the actual possession of the premises. In Gratz v. Benner, 13 S. & R. 110, it was attempted to restrict this section to persons found in possession by the sheriff who were not named in the writ, and the terms of the enactment favoured the argument; but Chief Justice Tilghman

declared that immediately after the passing of the act and ever since, a construction has prevailed which extends the evidence, arising from the sheriff's return, *to all of the defendants*.    To the same effect see Cooper *v.* Smith, 9 S. & R. 26, and Dietrich *v.* Mateer, 10 Id. 151.

The plaintiff, therefore, proves the defendant in possession when he gives in evidence the service of the writ, but it is only *primâ facie* evidence, and may be rebutted.    Its effect is to shift the *onus* to the shoulders of the defendant.    He must prove, after the sheriff's return is in evidence, that he is *not in* possession, and that proved, he is entitled to a verdict for his costs.    But as it is in its nature a question of fact, it must be proved to the satisfaction of the jury and is not to be found by the court.    The plea of Leonard, Jr., concluded to the country, and this ground of defence was peculiarly within the province of the jury.    It cannot be said there was no evidence to submit to them, for there was first, the sheriff's return with its legal effect as stated above, and then there were the declarations of Leonard, Jr., to Hackett in reference to the property on the railroad—the six-acre lot as we understand it—that that property was his ; that his uncle William (the late owner) had written a letter to him, if he would come over and stay with him, he would give him that property ; that he had come over and now intended to claim it ; that he would see if he could not hold it.    And next there was the evidence of Samuel Hoover, who swore that whilst his brother was tenant of William Leonard's railroad house and lot, he saw Edward B. Leonard, Jr., there, superintending property, planting trees, &c., after William Leonard's death.

There was other evidence to the same effect from witnesses on the part of the defence, but the above evidence was all given on behalf of the plaintiffs ; and was before the court and jury when the learned judge directed a verdict for Leonard, Jr., on the ground that he was not in possession of any of the premises except for the house in respect to which he had confessed judgment.    In that direction, there was manifest error.    The question should have been submitted to the jury.

But was it right to submit it at that time ?    In other words, was there anything apparent in the case which called upon the court to exercise their discretion to give the defendants separate trials ?    When a plaintiff in ejectment includes unnecessary parties in his suit, merely with a view of shutting their mouths as witnesses, his suit is, as to such parties, vexatious, and ought to be disposed of like other actions of trespass against several defendants, only some of whom are guilty.    The practice is, to take a verdict for defendants in trespass, against whom the plaintiff has failed to make out his case, and to take it, pending the trial against other parties, and I see no objection to applying this prac-

[Helfenstein *v.* Leonard.]

tice to actions of ejectment. Whether such a verdict in ejectment would qualify the acquitted parties to testify for their fellow-defendants will be considered when a case presents it fairly, but for the present, it is enough to say, that we do not think this case was ground for a just appeal to the discretion of the court for separate verdicts. The plaintiffs were not bound to show that the defendants stood in the relation of landlord and tenant, and finding them both in possession of premises, which the plaintiffs claimed to own, there was nothing vexatious in including both in the writ. But though they were landlord and tenant, we have seen that they were in, under one and the same title, and that there was evidence of Leonard Jr.'s possession of more than the house and lot occupied by him. Then to these considerations, add the great fact that the titles of the parties litigant, depended on the alleged spoliation by both defendants, but especially by Leonard, Jr., of the will of William Leonard, deceased; and is it not apparent, that if ever there was an ejectment, in which two defendants should have been placed before a jury on the same evidence, this was that case? To judge of the soundness of the discretion exercised, may not be our appropriate duty, but whether it was a case for the exercise of a judicial discretion is an appropriate question for us, and when we look at all the circumstances, and especially at the fact that a will was made by William Leonard for this property, in favour of the now deceased husband of Mrs. Helfenstein, and that she alleged, upon testimony more or less convincing, a fraudulent destruction of that will by the defendants; we cannot esteem her joinder of these defendants, one of those unnecessary and vexatious uses of process, which demanded or justified the interposition of the judge. He should have allowed the cause to take the ordinary course.

Had he done so, there would have been no question about the competency of Edward B. Leonard, Jr., as a witness, for he would not have been offered. As the record stands, however, this question is raised, and we despatch it by saying that on two grounds—the public policy which excludes a party to the record, and the interest which springs from liability for costs and mesne profits—he ought to have been excluded. We decided a case on these principles at Pittsburgh last fall, which was ejectment against three—a confession of judgment by one of the defendants, and an offer of him as a witness for his fellows. There was no verdict and judgment for one of the defendants, pending the trial as against the others, and in this particular that case is distinguishable from the present, but the reasonings and authorities in the opinion of my brother Agnew cover the question here. See the case of The Cambria Iron Company *v.* Tomb, 12 Wright 387.

These observations dispose of all the points preliminary to the main question in the cause, which was, as intimated above, whe-

[Helfenstein *v.* Leonard.]

ther the will of William Leonard was revoked and destroyed by him or by his direction in his lifetime ; or whether it was surreptitiously destroyed either in his lifetime or after his death.    That was a question of fact on which all the evidence bore, more or less directly, but which it is not our business to discuss.

We think it was fairly submitted to the jury by the learned judge, and that his answers to the several points propounded, when taken in connection with his charge, were unexceptionable. The third assignment of error does not deal quite candidly with the judge, for it breaks off the thought which he was expressing, at a comma, and omits all the rest of the sentence which he employed to express his thought.    We think it incontrovertible law, that when a will is shown to be in possession of a testator, and cannot be found or produced after his death, the legal presumption, in the absence of all proof on the subject, is, that it was destroyed by the testator ; but this presumption may be rebutted by evidence tending to show a spoliation by others, either in the lifetime or after the death of the testator.    This is exactly what the court laid down.

We have already said enough to show that we think there was error in submitting the testimony of Edward B. Leonard, Jr.; but in view of all the testimony, and especially of that of Dr. Ward, we see no ground for the complaint that the court said there was evidence from which the jury might infer a destruction of the will by William Leonard in his lifetime, irrespective of the testimony of Edward B. Leonard, Jr.    Without discussing the effect of the evidence, we decide that there was no error in this answer of the court.

Had the court distinctly charged that the title of the defendants must prevail, in the absence of clear and *conclusive* evidence of a will remaining unrevoked at the death of the testator, it would have been exceptionable, for that would have required a higher standard of proof than forensic controversies ordinarily can bear ; but though the word " conclusive" was in the point affirmed, the learned judge used the words " clear and satisfactory" in affirming it, and these are the words which weighed with the jury.    We see no fault in them.

The answers to the fourth and fifth points, with the limitations and distinctions of the charge, were right enough.    And the true way to read answers to abstract propositions, is in the light of the charge, for that is the manner in which such answers are received by the jury.    Counsel gain nothing by assigning errors upon the broken fragments of a thought or sentence, for we reverse judgments only for substantial and influential errors.

The judgments for defendants are both reversed, and a *venire facias de novo* is awarded.